No. 26-2689

# United States Court of Appeals for the Eighth Circuit

*Cattle Class v. Cargill, Inc., et al.*

On Grant of Rule 23(f) Petition
Appeal from the United States District Court
for the District of Minnesota, No. 0:22-MD-3031
The Honorable John R. Tunheim

## APPELLANTS' BRIEF


Noel J. Francisco
Julie E. McEvoy
**JONES DAY**
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
(202) 879-3939
njfrancisco@jonesday.com
jmcevoy@jonesday.com

Eddie Hasdoo
**JONES DAY**
110 North Wacker, Suite 4800
Chicago, Illinois 60606
(312) 269-4214
ehasdoo@jonesday.com

Benjamin L. Ellison
**JONES DAY**
90 South Seventh Street, Suite 4950
Minneapolis, MN 55402
(612) 217-8800
bellison@jonesday.com

Michelle Fischer
Samuel Evan Milner
**JONES DAY**
901 Lakeside Avenue
Cleveland, OH 44114
(216) 586-3939
mfischer@jonesday.com
smilner@jonesday.com

Kurt Johnson
**JONES DAY**
150 W Jefferson Ave Suite 2100
Detroit, MI 48226
(313) 733-3939
kajohnson@jonesday.com

***Counsel for Appellant National Beef Packing Company, LLC***

Karl J. Worsham
**ASHURST PERKINS COIE US LLP**
2525 E. Camelback Road, Suite 500
Phoenix, Arizona 85016
Tel: (602) 351-8000
Karl.Worsham@ashurstperkins.com

Susan E. Foster
**ASHURST PERKINS COIE US LLP**
1301 Second Ave, Suite 4200
Seattle, WA 98101-3804
Tel: (206) 359-8000
Susan.Foster@ashurstperkins.com

Veronica N. Onyema
**ASHURST PERKINS COIE US LLP**
700 13th Street, NW, Suite 800
Washington, DC 20005-3960
Tel: (202) 654-6200
Veronica.Onyema@ashurstperkins.com

***Counsel for Appellants Tyson Foods, Inc. and Tyson Fresh Meats, Inc.***

Kosta S. Stojilkovic
David R. Friedman
**WILKINSON STEKLOFF LLP**
2001 M Street, NW, 10th Floor
Washington, DC 20036
(202) 847-4010
kstojilkovic@wilkinsonstekloff.com
dfriedman@wilkinsonstekloff.com

X. Kevin Zhao
Holley Horrell
**GREENE ESPEL PLLP**
222 S. Ninth Street, Suite 2200
Minneapolis, MN 55402
(612) 373-0830
kzhao@greeneespel.com
hhorrell@greeneespel.com

Aaron D. Van Oort
John L. Rockenbach
**FAEGRE DRINKER BIDDLE & REATH LLP**
90 South 7th Street
2200 Wells Fargo Center
Minneapolis, MN 55402
(612) 766-7000
aaron.vanoort@faegredrinker.com
john.rockenbach@faegredrinker.com

***Counsel for Appellants Cargill, Incorporated and Cargill Meat Solutions Corporation***

## SUMMARY OF THE CASE

Plaintiffs-Appellees allege a conspiracy by Defendants-Appellants involving fed cattle. To bring their case as a class action, Plaintiffs had the burden to show common issues predominate over individual ones, by showing common impact—from the conspiracy they allege, on the class they represent. They failed to do so.

First, Plaintiffs failed to establish common impact *from the conspiracy they allege*. Plaintiffs (fed cattle sellers) contend Defendants (fed cattle buyers) agreed to reduce the purchase and slaughter of fed cattle to reduce their price. Critically, however, the alleged conspiracy centered on *episodic* conduct: Defendants' alleged buying conduct and Plaintiffs' actual selling conduct started and stopped throughout the alleged conspiracy. Further, Plaintiffs assert the conspiratorial conduct would harm them only through an *elongated* chain of causation: the conspiracy could cause impact only after working through different transaction types and across different geographic locations. Yet Plaintiffs failed to show the challenged episodic conduct would work through the elongated chain of causation to lead to common impact.

Second, Plaintiffs failed to establish common impact *on the class they represent*. Plaintiffs represent a class of fed cattle producers. Yet Plaintiffs did not attempt to show common impact on that class at all, but only on a proxy, and one revealing many unimpacted class members.

Defendants respectfully request 20 minutes per side for oral argument.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a) and 28(a)(1), Defendants-Appellants make the following disclosures:

Defendant-Appellant National Beef Packing Company, LLC ("National Beef") certifies that National Beef is majority owned by NBM US Holdings, an indirect subsidiary of MBRF Global Foods S.A. ("MBRF"). MBRF is thus identified as the parent corporation of National Beef and the only publicly held corporation that owns 10% or more of National Beef stock.

Defendant-Appellant Tyson Foods, Inc. has no parent corporation, and no other publicly held corporation owns 10% or more of its stock. Defendant-Appellant Tyson Fresh Meats, Inc. is a wholly owned subsidiary of Tyson Foods, Inc. No publicly held corporation other than Tyson Foods, Inc. owns 10% or more of Tyson Fresh Meats, Inc.'s stock.

Defendants-Appellants Cargill, Incorporated and Cargill Meat Solutions Corporation certify as follows: Cargill Meat Solutions Corporation is a wholly owned subsidiary of Cargill, Incorporated, a private company. No publicly held corporation owns 10% or more of Cargill, Incorporated stock.

**TABLE OF CONTENTS**

**Page**

SUMMARY OF THE CASE ........ iii

CORPORATE DISCLOSURE STATEMENT ........ iv

JURISDICTIONAL STATEMENT ........ xi

STATEMENT OF THE ISSUE PRESENTED FOR REVIEW ........ xii

INTRODUCTION ........ 1

STATEMENT OF THE CASE ........ 7

A. Factual Background ........ 7

1. Fed Cattle Production ........ 7

2. Fed Cattle Marketing ........ 9

B. Procedural Background ........ 13

1. The Theory Asserted By Plaintiffs ........ 13

2. The Evidence Offered By Lamb ........ 16

3. The Decision Issued By The District Court ........ 20

SUMMARY OF ARGUMENT ........ 22

STANDARD OF REVIEW ........ 24

ARGUMENT ........ 25

I. Common Issues Do Not Predominate Given Plaintiffs' Failure to Offer Evidence Showing Common Impact From The Conspiracy They Allege. ........ 25

A. Plaintiffs Failed To Offer Evidence Of Common Impact From The Conspiracy They Allege. ........ 25

1. No Common Impact Given Episodic Conduct. ........ 26

2. No Common Impact Given Elongated Chain Of Causation. ........ 31

B. Nothing Plaintiffs Offer Can Sustain The Certification Order. ........ 36

**TABLE OF CONTENTS**
(continued)

**Page**

II. Common Issues Do Not Predominate Given Plaintiffs' Failure to Offer Evidence Showing Common Impact On The Class They Represent. ..........43

A. No Common Impact Given The Use Of A Proxy. ..............................44

B. No Common Impact Given That Use Of A Proxy Reveals Large Numbers Of Unimpacted Class Members..........................................48

III. This Court Should Do What The District Court Failed to Do and Hold This Case Cannot Proceed On A Class Basis. ......................................................50

CONCLUSION ..........................................................................................52

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) ... 22

*Avritt v. Reliastar Life Ins. Co.*,
615 F.3d 1023 (8th Cir. 2010) ... xii, 43

*Best Pallets Inc. v. Brambles Indus., Inc.*,
2009 WL 10672543 (W.D. Ark. Aug. 17, 2009) ... 40

*Blades v. Monsanto Co.*,
400 F.3d 562 (8th Cir. 2005) ... passim

*Cody v. City of St. Louis ex rel. Med. Sec. Inst.*,
103 F.4th 523 (8th Cir. 2024) ... 24

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) ... passim

*Ebert v. Gen. Mills, Inc.*,
823 F.3d 472 (8th Cir. 2016) ... 52

*Glasscock v. Sig Sauer, Inc.*,
182 F.4th 740 (8th Cir. 2026) ... xii, 43, 45, 49

*Harris v. Union Pac. R.R. Co.*,
953 F.3d 1030 (8th Cir. 2020) ... 52

*Hudock v. LG Elecs. U.S.A., Inc.*,
12 F.4th 773 (8th Cir. 2021) ... 22

*In re Aluminum Warehousing Antitrust Litig.*,
336 F.R.D. 5 (S.D.N.Y. 2020) ... passim

*In re Asacol Antitrust Litig.*,
907 F.3d 42 (1st Cir. 2018) ....................................................................22, 33

*In re Cattle and Beef Antitrust Litig.*,
No. 19-cv-1222 (D. Minn. July 15, 2019) ..................................................13, 14

*In re Flash Memory Antitrust Litig.*,
2010 WL 2332081 (N.D. Cal. June 9, 2010)....................................................40

*In re Graphics Processing Units Antitrust Litig.*,
253 F.R.D. 478 (N.D. Cal. 2008)....................................................................40

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
2025 WL 3240044 (S.D.N.Y. Nov. 20, 2025)....................................................40

*In re Lamictal Direct Purchaser Antitrust Litig.*,
957 F.3d 184 (3d Cir. 2020) ..........................................................................41

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
522 F.3d 6 (1st Cir. 2008) ........................................................... xii, 33, 34

*In re Outpatient Med. Ctr. Emp. Antitrust Litig.*,
2026 WL 1678954 (N.D. Ill. June 10, 2026)....................................................40

*In re Pharmacy Benefit Managers Antitrust Litig.*,
2017 WL 275398 (E.D. Pa. Jan. 18, 2017)........................................................40

*In re State Farm Fire & Cas. Co.*,
872 F.3d 567 (8th Cir. 2017)..........................................................................52

*Johannessohn v. Polaris Indus. Inc.*,
9 F.4th 981 (8th Cir. 2021)...........................................................43, 45, 46, 49

*Lab'y Corp. of Am. Holdings v. Davis*,
605 U.S. 327 (2025)......................................................................................50

*Miami Prods. & Chemical Co. v. Olin Corp.*,
2023 WL 8946114 (W.D.N.Y. Dec. 28, 2023).......................................37, 38, 42

*Nypl v. JP Morgan Chase & Co.*,
2022 WL 819771 (S.D.N.Y. Mar. 18, 2022)....................................................29

*Nypl v. JP Morgan Chase & Co.*,
2023 WL 2712214 (S.D.N.Y. Mar. 30, 2023), *aff'd sub nom. McCarthy v. Bank of Am., N.A.*, 2024 WL 2206794
(2d Cir. May 16, 2024) .........................................................................30

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
31 F.4th 651 (9th Cir. 2022)...................................................................45

*Sample v. Monsanto Co.*,
218 F.R.D. 644 (E.D. Mo. 2003) ............................................................27

*Tex. Grain Storage, Inc. v. Monsanto Co.*,
2019 WL 4087430 (W.D. Tex. June 24, 2019) ..........................................37

*Union Pac. R.R. Co. v. U.S. Dep't of Homeland Sec.*,
738 F.3d 885 (8th Cir. 2013)...................................................................51

**RULES**

Fed. R. App. P. 10(e) ..........................................................................14

Fed. R. Civ. P. 23.....................................................................................6

Fed. R. Civ. P. 23(a) ..............................................................................20

Fed. R. Civ. P. 23(b)(2) ..........................................................................20

Fed. R. Civ. P. 23(b)(3) ....................................................................passim

Fed. R. Evid. 201 ....................................................................................14

**STATUTES**

28 U.S.C. § 1292(e) ...............................................................................xi

28 U.S.C. § 1331 .....................................................................................xi

28 U.S.C. § 1332(d) .......... xi

28 U.S.C. § 1337 .......... xi

**OTHER AUTHORITY**

1 McLaughlin on Class Actions § 5:36 (21st ed.) .......... 25

ABA Section of Antitrust Law, Econometrics: Legal, Practical, and Technical Issues 220 (2005) .......... 40

Federal Judicial Center, Reference Manual on Scientific Evidence 432 (3d ed. 2011) .......... 25

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331, 1332(d), and 1337. The district court issued its class certification order, *In re Cattle and Beef Antitrust Litig.*, No. 22-md-03031 (D. Minn. July 16, 2026); R.Doc. 1609, on July 16, 2026. Defendants-Appellants timely filed their petition for permission to appeal with the Clerk of this Court on July 30, 2026. This Court granted permission to appeal the district court's class certification order and docketed the case under appeal No. 26-2689. *Cattle Class v. Cargill, Inc.*, No. 26-8010 (8th Cir. Aug. 24, 2026). This Court has jurisdiction under 28 U.S.C. § 1292(e) and Federal Rule of Civil Procedure 23(f).

## STATEMENT OF THE ISSUE PRESENTED FOR REVIEW

Whether Plaintiffs-Appellees failed to carry their burden to establish the predominance of common issues under Rule 23(b)(3), and the district court therefore erred in certifying the class, because:

I. Plaintiffs-Appellees allege a conspiracy centered on episodic conduct and involving an elongated chain of causation, yet failed to offer evidence showing common impact from that conspiracy.

- *Blades v. Monsanto Co.*, 400 F.3d 562 (8th Cir. 2005)
- *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013)
- *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5 (S.D.N.Y. 2020)
- *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6 (1st Cir. 2008)

II. Plaintiffs-Appellees represent a class of fed cattle producers, yet did not attempt to show common impact on that class at all, but only impact on a proxy, and one revealing many unimpacted class members.

- *Blades v. Monsanto Co.*, 400 F.3d 562 (8th Cir. 2005)
- *Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023 (8th Cir. 2010)
- *Glasscock v. Sig Sauer, Inc.*, 182 F.4th 740 (8th Cir. 2026)

## INTRODUCTION

This appeal arises from an antitrust multidistrict litigation with five putative class actions brought against Defendants-Appellants concerning their beef-packing operations. Two cases involve cattle producers "upstream" of Defendants. Three cases involve beef purchasers "downstream" of Defendants. Plaintiffs-Appellees in this case are a subset of the upstream cattle producers—specifically, those who directly sold fed cattle to Defendants. Plaintiffs assert a conspiracy involving alleged periodic reductions in Defendants' purchase and slaughter of fed cattle, claiming this conspiracy impacted all (or nearly all) fed cattle producers for nearly five years.

Plaintiffs seek to advance their case for damages on a class basis. That means they must satisfy the requirements of Rule 23(b)(3), including by showing that common issues in the case predominate over individual ones. To make that showing, Plaintiffs had to carry their burden to prove common impact—they had to prove that impact from the alleged conspiracy, on the represented class, can be shown with evidence common to the class. Without that proof, the central question of whether Defendants' alleged unlawful conduct actually harmed the class will be subject to individual inquiries, and individual issues will thus predominate over common ones such that the predominance requirement of Rule 23(b)(3) is unmet.

For two independent reasons, Plaintiffs failed to carry their burden to prove common impact, and the predominance requirement in Rule 23(b)(3) is thus unmet.

The first reason goes to Plaintiffs' failure to offer evidence showing common impact *from the conspiracy Plaintiffs allege*—one not only centered on episodic conduct but also involving an elongated chain of causation. Plaintiffs failed to show any episodic conduct at all, much less that the alleged episodic conduct would work through the elongated chain of causation to impact all (or nearly all) class members. The second reason goes to Plaintiffs' failure to offer evidence showing common impact *on the class Plaintiffs represent*—one comprising fed cattle producers. Plaintiffs did not attempt to show common impact on that class at all, but only impact on a proxy, and one revealing many unimpacted class members.

***No Common Impact From The Alleged Conspiracy.*** Plaintiffs allege a conspiracy involving the purchase and slaughter of fed cattle. Plaintiffs do not assert a traditional antitrust conspiracy. They do not assert Defendants agreed to set the prices of, nor suppress the total supply or slaughter of, fed cattle. Nor could they. Nothing in the record suggests Defendants agreed to set prices, and Plaintiffs concede Defendants purchased and slaughtered every fed cattle available to them.

Faced with these facts, Plaintiffs resorted to a novel conspiracy theory: they allege that Defendants periodically, sporadically, or (to use the term most often used below) *episodically* reduced their purchase and slaughter of fed cattle, and that these episodic reductions in turn depressed the price of fed cattle. Whatever the viability of this theory—which Defendants emphatically reject—for Plaintiffs' case on the

merits, relying on it vastly increases the difficulty of advancing this case on a class basis. That is because the theory has at its core episodic conduct with, at most, episodic impact—not sustained conduct with sustained impact, the more typical grist for a class case. And Plaintiffs' case is more difficult still because, not only was Defendants' alleged buying conduct episodic, Plaintiffs' actual selling conduct was also episodic. Many fed cattle producers do not sell fed cattle daily, weekly, monthly, or even yearly. Indeed, twenty percent of those analyzed made only one sale during the entire five-year alleged conspiracy period. In short, Plaintiffs chose to bring a case premised on episodic conduct (whether alleged or actual) on both sides.

To advance that case on a class basis, Plaintiffs had to show that Defendants' alleged episodic buying conduct intersected with Plaintiffs' actual episodic selling conduct such that all (or nearly all) received lower fed cattle prices as a result of the Defendants' alleged conduct. *Yet Plaintiffs failed entirely to do so*. Plaintiffs' expert—Dr. Russell Lamb, the source of Plaintiffs' evidence of purported common impact—conceded that he did not identify a single episode of reduced slaughter, much less the multiple episodes he admitted would be necessary to create a sustained price effect. Nor did he show how those multiple (unidentified) episodes could somehow work together to lead to common impact across the nearly five-year alleged conspiracy period given Plaintiffs' own episodic selling conduct. Thus, determining whether class members were impacted would require individualized

inquiries. And that, in turn, means Plaintiffs failed to carry their burden to establish the predominance of common issues in this case.

But Plaintiffs' failure is even worse, because their case not only centers on episodic conduct, it also involves impact from that conduct only after an *elongated* chain of causation. Plaintiffs assert Defendants' alleged episodic reductions occurred in localized spot or cash markets for fed cattle. But most fed cattle producers did not sell their fed cattle in a cash market; instead, most sold them through an array of different contracts—alternative marketing arrangements (AMAs) that incorporated different pricing formulas. Further, these different types of sales took place in multiple regions. Accordingly, to show common impact, and thus the predominance of common issues, Plaintiffs had to show not only that there were enough alleged episodic reductions across the five-year alleged conspiracy period, but that the impact from these alleged episodes, undertaken in some local cash market, worked through different contract types and across different locations to affect all (or nearly all) class members. They had to demonstrate through common, classwide proof that *each link in the causal chain*—the workings of the alleged conspiracy—actually occurred. *Yet, once again, Plaintiffs failed entirely to do so*.

Plaintiffs have thus failed to carry their Rule 23(b)(3) burden. They failed to offer evidence showing that impact from the conspiracy they allege—centered on episodic conduct and also involving an elongated chain of causation—"can be

proven on a systematic, classwide basis." *Blades v. Monsanto Co.*, 400 F.3d 562, 575 (8th Cir. 2005). Determining any impact would require individual inquiries from one cattle producer to another to assess whether the price received for their fed cattle could be traced back through the elongated, attenuated chain of causation Plaintiffs allege, to one or more of the episodic slaughter reductions Plaintiffs allege. Those individualized inquiries would predominate over any common questions. *See id.*

The district court all but recognized as much, acknowledging that "Defendants may be correct that the alleged episodic conduct had only episodic impact." Addendum 30; App.30; R.Doc. 1609 at 30. That should have led to an obvious outcome: denying Plaintiffs' motion for class certification. If Defendants "may be correct" about "only episodic impact," then Plaintiffs plainly did not prove common impact, and therefore did not carry their burden to show that common issues predominate. But rather than deny certification, the district court held that Defendants could "present evidence" of episodic impact "to the fact finder at trial." *Id.* So doing, the district court committed clear legal error.

***No Common Impact On The Represented Class.*** Plaintiffs also have failed to show the predominance of common issues for another reason—they failed to demonstrate common impact on the class they represent. This Court has held that a class cannot be certified when the evidence shows any class member lacks Article III standing. Other courts, including the district court below, have applied a different

standard focused on Rule 23(b)(3), holding that a class can still be certified where some class members are unimpacted (and thus lack Article III standing) as long as the lack of impact is de minimis.

Whatever standard applies, the evidence Plaintiffs offered confirms they failed to show common impact for two reasons. The first is that the evidence offered does not actually concern the class of fed cattle producers Plaintiffs represent and instead concerns a purported proxy: feedlots. Some feedlots are indeed class members, but many sell fed cattle only on behalf of actual class members; they are not class members themselves. However, both Rule 23 and this Court's precedents require plaintiffs to show common impact on actual class members, not a proxy. The second reason is that, even permitting Plaintiffs to proceed by proxy, the proxy Plaintiffs chose reveals thousands upon thousands of potentially unimpacted class members—far too many to allow certification. Accordingly, Plaintiffs failed to carry their burden to show common impact on the class they represent and, thus, the predominance of common issues over individual ones.

As to this issue, too, the district court recognized the deficiency in Plaintiffs' motion for certification, noting that the evidence they offered "rests on data covering only feedlot transactions, not class member [*i.e.*, fed cattle producer] transactions." The court nevertheless held, without support, that using the feedlot proxy was acceptable. With this decision, the district court again committed clear legal error.

* * *

The district court certified a class seeking $27 *billion* in damages. And it did so even though Plaintiffs failed to carry their burden to show predominance under Rule 23(b)(3) in the most fundamental ways: they failed to show common impact from the conspiracy they allege, and they failed to show common impact on the class they represent. Each is an independent reason for this Court to hold that the class should not have been, and cannot be, certified. This Court should reverse and remand with instructions to deny certification.

## STATEMENT OF THE CASE

The following Factual Background and Procedural Background provide important context for this appeal.

### A. Factual Background

Two areas of factual background—fed cattle production and fed cattle marketing—are most pertinent.

#### 1. Fed Cattle Production

The fed cattle production process is noteworthy for both the time it takes and the number of steps involved. Both features make fed cattle production much more complex than that of other meats, such as pork or chicken. *See* App.157, 162; R.Doc. 883-1 ¶¶ 17, 27 (contrasting pork or broiler poultry); App.819-21; R.Doc. 1099-2 at 202:5-204:11 (contrasting pork).

In terms of time, from gestation to slaughter, it can take over three years to produce fed cattle. App.157, 162-63; R.Doc. 883-1 ¶¶ 17, 28-29.

In terms of steps, many different stakeholders participate in the production process, which begins with "cow-calf operators" who maintain cows suitable for breeding. App.158-59; R.Doc. 883-1 ¶ 19. Each year, these cow-calf operators decide how many heifers and cows to retain for breeding and how many to sell for eventual slaughter. App.161-62; R.Doc. 883-1 ¶ 25. The animals retained for breeding have a nine-month gestation period, and the cow-calf operators raise the calves from birth until they are weaned. App.163; R.Doc. 883-1 ¶ 29. Weaned calves can follow different paths to slaughter. Some are purchased, housed, and raised by intermediaries known as "backgrounders" or "stockers" before going to a feedlot. App.167-69; R.Doc. 883-1 ¶¶ 34-40. Others remain owned by a cow-calf operator or some other stakeholder until they are delivered to a feedlot. App.167-70; R.Doc. 883-1 ¶¶ 34-43. No matter how they arrive at a feedlot, the cattle, now known as "feeder cattle," App.159-60; R.Doc. 883-1 ¶ 21, are fed a high-energy diet until they reach a weight suitable for slaughter, at which time they become "fed cattle." App.169-70; R.Doc. 883-1 ¶¶ 41-42. Beef packers, including Defendants, then purchase and slaughter the fed cattle to produce beef. App.181-82; R.Doc. 883-1 ¶¶ 61-62.

Beef packers, including Defendants, do not control the supply of fed cattle. Instead, cow-calf operators determine the supply of fed cattle by deciding how many cows to breed roughly three years before they become the fed cattle that Defendants buy, slaughter, and process into beef. App.255-56; R.Doc. 883-1 ¶¶ 201-02.

### 2. Fed Cattle Marketing

There are multiple ways fed cattle are marketed, and ultimately sold, to beef packers. The differences go to transaction type, cattle ownership, sale location, and sale frequency.

#### a. Transaction Type

The traditional way to market and sell fed cattle is through a spot or cash sale in a cash market, in which the buyer and seller negotiate a cash price to be paid upon the delivery of fed cattle. App.215-16; R.Doc. 883-1 ¶ 130. Because of the cost and risk involved in transporting fed cattle over long distances, these cash markets are regional. *See* App.172-73, 215, 237; R.Doc. 883-1 ¶¶ 47, 128, 173. The United States Department of Agriculture (USDA) recognizes five primary regional marketing areas for fed cattle cash price reporting and tracking: (1) Texas/Oklahoma/New Mexico, (2) Kansas, (3) Nebraska, (4) Colorado, and (5) Iowa/Minnesota. App.172-73, 217; R.Doc. 883-1 ¶¶ 47, 133.

Approximately 25% of fed cattle sales occurred in a cash market during the alleged conspiracy period (although this percentage varied significantly by region

(*see* App.222; R.Doc. 883-1 ¶ 145)). The remaining sales occurred pursuant to alternative marketing arrangements. *See* App.221-22; R.Doc. 883-1 ¶ 144 & Fig. 21. These AMAs are designed to recognize quality cattle through individualized premiums (for higher quality) and discounts (for lower quality) for each head of fed cattle in a pen of fed cattle sold for slaughter. App.531-32; R.Doc. 1093-1 at 3-4. While AMAs vary, most are tied in some way to the price of fed cattle in a cash market plus or minus an agreed-upon spread (*e.g.*, the Kansas region negotiated cash price plus or minus $0.XX per 100 pounds of fed cattle) as well as premiums or discounts tied to various factors specified in the contract. App.220, 270-71; R.Doc. 883-1 ¶¶ 141, 235-36. Negotiated cash prices for the region where the AMA is in place are commonly used as the base price in AMA pricing formulas. App.339; R.Doc. 883-1 ¶ 392.

#### b. Cattle Ownership

No matter whether the fed cattle are sold in a cash market or through some form of AMA, the party who owns the fed cattle at the time of sale for slaughter can differ based on the varied ways a feedlot may participate in "finishing" (*i.e.*, the final growth phase) fed cattle before slaughter. App.170; R.Doc. 883-1 ¶ 43.

Although fed cattle generally are sold to packers by feedlots, there are variations concerning ownership of the feeder (and then fed) cattle at the feedlot. Sometimes fed cattle producers have their own feedlots and breed and feed their own

cattle until they sell them for slaughter. App.159-60, 170; R.Doc. 883-1 ¶¶ 21, 43. Sometimes feedlots buy feeder cattle from others, feed the cattle, and then sell them as fed cattle for slaughter. *Id.* In both of these variations, the feedlot that sells the fed cattle owns them at the point of sale.

Most relevant here is a variation in which fed cattle producers pay a feedlot, often called a "custom feedlot," to feed the cattle while the producers retain ownership until the fed cattle are sold to a packer for slaughter. *Id.* A large percentage of fed cattle producers opt for such arrangements. App.168; R.Doc. 883-1 ¶¶ 36, 38. In such arrangements, a single feedlot can sell fed cattle on behalf of as many as 100 fed cattle producers. App.170; R.Doc. 883-1 ¶ 43 n.67. There are further variations on the theme, including arrangements by which the feedlot shares ownership of the cattle with the fed cattle producer or offers some form of risk-sharing arrangement, or a creditor has an interest in the fed cattle. *See* App.851-52; R.Doc. 1099-5 at 40:7-41:10 (named plaintiff explaining that he "[o]ccasionally" "enter[s] into a partial interest arrangement with feed lots"), App.853-54; R.Doc 1099-5 at 83:5-84:17 (similar).

Due to these variations, Defendants generally do not know, and their records typically do not show, the actual owners of the fed cattle they purchase. *See* App.843-44; R.Doc. 1099-2 at 372:14-373:9 (admitting, with certain exceptions, that Lamb "cannot tell from any of the data or documents produced in this case or

that [he has] otherwise reviewed who actually owns the fed cattle"). This is a significant fact, because the actual owners of the fed cattle are the class members in this case.

#### c. Sales Location

Because transporting fed cattle to beef packers is costly—both in terms of the direct expense to transport and the risks to animal health—most feedlots are located, and most fed cattle are sold near beef packing plants. App.172-73, 237; R.Doc. 883-1 ¶¶ 47 & Table 2, 173; *see* App.582-83; R.Doc. 1099 ¶ 79 & Exhibit 5. During the relevant period, Defendants operated packing plants in Arizona, California, Colorado, Illinois, Iowa, Kansas, Texas, Michigan, Minnesota, Nebraska, Pennsylvania, Utah, Washington, and Wisconsin. App.200, 237; R.Doc. 883-1 ¶¶ 100 Fig. 12 & 174.

#### d. Sales Frequency

Given the small size of many cow-calf operators, feedlots, and other fed cattle producers, and in light of the time required to raise fed cattle for slaughter, many fed cattle producers sell fed cattle only sporadically. And many of the class members only made irregular (or episodic) sales to Defendants: throughout the entire alleged conspiracy period, approximately half of the at-issue feedlots (whether selling for themselves or as many as 100 fed cattle producers) had five or fewer transactions

with Defendants, and twenty percent of them had only a single transaction. App.1061-62; R.Doc. 1257-1 ¶ 188; App.600; R.Doc. 1099 ¶ 115.

### B. Procedural Background

This appeal concerns the fed cattle producer damages class certified by the district court. As to that class, three areas of background are most important: the theory asserted by Plaintiffs, the evidence offered by their expert, Dr. Russell Lamb, and the decision issued by the district court.

#### 1. The Theory Asserted By Plaintiffs

Plaintiffs advance a novel conspiracy theory on behalf of the class. They do not allege any agreement to set prices. *See* App.147-48; R.Doc. 883-1 ¶ 9; App.548; R.Doc. 1099 ¶ 25. Nor do they assert any agreement to suppress the total purchase or slaughter of fed cattle. As Lamb himself conceded, "there's no doubt that every steer gets slaughtered and processed into beef during the class period that is on feed during the class period." App.499-500; R.Doc. 1093 at 134:21-135:2.

Plaintiffs instead allege something much different than a traditional antitrust conspiracy: a conspiracy comprised of episodic conduct. In particular, they assert that Defendants "periodically reduce[d] [their] respective purchase and slaughter volumes in order to reduce the prices [they] would otherwise pay for fed cattle." Third Am. Compl. ("Compl."), *In re Cattle and Beef Antitrust Litigation*, No.

19-cv-1222 (D. Minn.), R.Doc. 313, ¶ 18; *see also* App.910; R.Doc. 1256 at 1 ("Defendants did not continually back up the fed cattle supply").[1]

Plaintiffs chiefly call this alleged episodic slaughter reduction "backing up," *i.e.*, the queue of fed cattle ready for slaughter and available in a spot or cash market gets "backed up" because Defendants reduce their purchases in that market. App.305-06; R.Doc. 883-1 ¶ 319. According to Plaintiffs, this backing up gave "Defendants leverage in negotiations with [fed] cattle producers," and thus affected the price of fed cattle, both in the cash markets and in any AMAs tied to cash market prices, because fed cattle have only "a short window in which to be optimally marketed" before they become too fed (and thus too fat) and begin to lose value. App.306; R.Doc. 883-1 ¶¶ 320-21.

At times, Plaintiffs have also mentioned other conduct beyond backing up—sometimes referring to this conduct as other "levers" of Defendants' alleged conspiracy. Specifically, Plaintiffs have asserted Defendants engaged in "periodic restraint of their purchase and slaughter volume," engaged in "market share management," and engaged in "other coordinated conduct." App.910, 913; R.Doc. 1256 at 1, 4.

---

[1] Plaintiffs' operative Third Amended Complaint was filed in *In re Cattle and Beef Antitrust Litigation*, No. 19-cv-1222 (D. Minn.), which is a separate docket from the consolidated class action from which this appeal arises. Should this Court not supplement the record with this additional complaint, *see* Fed. R. App. P. 10(e), it may take judicial notice of its existence on the docket, *see* Fed. R. Evid. 201.

Regardless of the terminology, the important point is that this other conduct is (or these "levers" are) all indisputably episodic as well. "Periodic restraint of [Defendants'] purchase[s]" is, by definition, "periodic" or episodic. Plaintiffs have described "market share management" as Defendants "'backing-up' producers," which is similarly episodic. App.81-82; R.Doc. 880 at 1-2; App.910; R.Doc. 1256 at 1. And the only alleged "other coordinated conduct" Plaintiffs identified in support of class certification was a so-called "queuing convention"—an alleged practice under which some feedlots, in some places, at some times allegedly gave the first bidder on fed cattle the opportunity to beat a later offer. App.82, 108; R.Doc. 880 at 2, 28; Compl. ¶¶ 159-65; App.899; R.Doc. 1099-14 at 330:5-6; App.60-62; R.Doc. 1099-15 at 164:23-166:19. On its face, this practice, too, is episodic.

Plaintiffs' theory, then, is that, Defendants employed some (or all) of these purported levers—chiefly backing up, but possibly other similarly episodic conduct—to reduce the price of fed cattle to impact all (or nearly all) fed cattle producers across the country throughout the five-year alleged conspiracy period. And they allege this impact no matter through what form or in what location fed cattle producers sold, and notwithstanding that many fed cattle producers sold only sporadically, and sometimes only once, during that entire five-year period. App.1061-62; R.Doc. 1257-1 ¶ 188; App.600; R.Doc. 1099 ¶ 115.

Plaintiffs' own expert, Lamb, summarized Plaintiffs' theory as follows: Defendants "[A] agreed to collectively restrain the volume of cattle purchased and [B] subsequently slaughtered below available supply … to [C] suppress demand for … cattle sold in the 'cash' market … [which] … [D] artificially reduced the prices at which fed cattle were sold in the 'cash' market, which in turn [E] artificially reduced prices of fed cattle sold through alternative marketing arrangements [that contained pricing mechanisms tied to cash cattle prices]" with the result that [F] all fed cattle prices were decreased. App.147-48; R.Doc. 883-1 ¶ 9; *see also* App.910; R.Doc. 1256 at 1.

### 2. The Evidence Offered By Lamb

To prevail on class certification, Plaintiffs must show by a preponderance of the evidence that they can prove their case theory using evidence common to the class. Plaintiffs' evidence rests on Lamb's opinions. He offered hundreds of pages of opinions purportedly relevant to that task. But Lamb also made clear that his ultimate opinion that the alleged conspiracy had common impact on the class was based chiefly on a common average price regression along with an attendant analysis he ran on fed cattle transactions, called an in-sample prediction. *See* App.332-34, 361-62; R.Doc. 883-1 ¶¶ 377 & Table 14, 409-10; *see also* App.795; R.Doc. 1099-2 at 140:5-10.

As for the regression, Lamb compared fed cattle prices before the alleged conspiracy to prices during the alleged conspiracy and then purported to account for (or regress) the different variables that might have affected those prices (*e.g.*, inflation, beef imports, etc.). App.317-30; R.Doc. 883-1 ¶¶ 341-69. Based on his analysis, Lamb concluded that, for reasons that "cannot be fully explained" (but that Plaintiffs attribute to the alleged conspiracy), fed cattle prices during the alleged conspiracy period were, on average, 6.7% lower than they should have been. App.154-55, 330, 332-34; R.Doc. 883-1 ¶¶ 15(b)(iii)(2), 370, 377 & Table 14.

Then, having determined the supposed average price for fed cattle that should have been received for fed cattle in the absence of Defendants' alleged conduct, Lamb performed an "in sample prediction" (App.361-62; R.Doc. 883-1 ¶ 409), by which he compared his predicted average price to the prices actually received on fed cattle transactions. If the price received was less than the predicted average price on even one transaction in his analysis for a given feedlot, he concluded (based on instructions from Plaintiffs' counsel) that there was impact to that feedlot from the alleged conspiracy. App.155-56, 334, 361-63; R.Doc. 883-1 ¶¶ 15.c), 379, 409-10, and 413 n.880. Under that measure, Lamb ultimately concluded that nearly all feedlots subject to his analysis were impacted.

The takeaway from the analysis, according to Lamb, is that the alleged conspiracy resulted in common impact on the class. App.362-63; R.Doc. 883-1 ¶ 413. Two features of Lamb's opinions are most relevant to this appeal.

The first feature concerns the relationship (or lack thereof) between Lamb's opinions and the conspiracy Plaintiffs allege. In particular, Lamb first acknowledged that Defendants' alleged backing up (or other episodic conduct or "levers") would have to occur "for some period of time" to cause an "effective" price reduction. *See* App.800, 804-05; R.Doc. 1099-2 at 150:2-9, 155:15-156:21. He then claimed this "period" would be approximately one to two weeks. *Id.*; *see also* App.802; R.Doc. 1099-2 at 153:4-6 ("a week or two" would be enough). But he thereafter admitted that a single episode of backing up (or other episodic conduct) for one or two weeks would not "be effective over the entire course of the class period." App.808; R.Doc. 1099-2 at 159:3-16. Accordingly, Lamb admitted the alleged unlawful conduct in this case—episodic slaughter reductions—would have, at most, only episodic impact. But Lamb then failed to show (or even attempt to explain) how this episodic conduct would impact all (or nearly all) class members. After all, many class members sold only occasionally during the nearly five-year class period. And most sold through AMAs, not in a cash market subject to any alleged slaughter reduction episode. And more still may have sold in geographic regions far away from any such alleged (but unidentified) episode. But Lamb did not address, much less analyze, any

of this; in fact, he admitted he did not even identify a single episodic reduction, acknowledging he "didn't do it." App.809; R.Doc. 1099-2 at 160:1-10.

The second feature concerns the relationship (or lack thereof) between Lamb's opinions and the class Plaintiffs represent. Rather than tie his regression and attendant in-sample prediction to fed cattle producers, the actual class members in this case, Lamb ran his analysis on feedlots, which he acknowledged are "not always the same as the [fed] cattle producer [*i.e.*, the actual class member] because sometimes a feedyard is custom feeding [*i.e.*, a "custom feedlot"] for the owner of the cattle." App.362; R.Doc. 883-1 ¶ 412. Based on his analysis, Lamb concluded that 98.6% of feedlots had at least one underpayment transaction during the alleged conspiracy period such that only 1.4% of the subject feedlots were unimpacted. *Id.*

Lamb then attempted to confirm the validity of using feedlots as a proxy for class members by running his analysis on yet another proxy, the "Payees" that one Defendant, Cargill, recorded in its purchasing data alongside the feedlot. Lamb asserted that these Payees were the actual fed cattle producers, *i.e.*, the actual class members, because they were the recipients (or the payees) of the feedlots' payments for the fed cattle. *Id.* The Payees, however, are not the actual class members; they are "simply the person or entity to whom [Cargill] was asked to provide payment for cattle" (App.890; R.Doc. 1099-6 at 8), which could have been a broker, lender, or any other designee—none of whom would be the actual class member. *Id.*

Nonetheless, in Lamb's reasoning, if these Payees were similarly impacted, it would show that an underpayment to the feedlot would flow through as an underpayment to the Payees—validating that impact on feedlots would mean impact on the actual class members. After conducting this further "analysis," Lamb concluded that there was a sufficiently similar impact on the Payees such that all or nearly all class members were impacted by the alleged conspiracy. App.362-65; R.Doc. 883-1 ¶¶ 413, 417.

### 3. The Decision Issued By The District Court

Relying on Lamb's opinions, Plaintiffs sought certification of three classes: a Rule 23(b)(3) damages class of those who sold fed cattle to Defendants, along with two ancillary classes—a Rule 23(b)(3) damages class of those that held long positions in certain futures contracts tied to the price of fed cattle, and a Rule 23(b)(2) injunctive relief class.

The district court denied certification of the latter two classes but certified the first class—the class at issue here. The district court began by addressing the Rule 23(a) factors, finding that each of the numerosity, typicality, commonality (none of which Defendants challenged) and adequacy requirements were satisfied, although the district court did find that one of the named Plaintiffs was an inadequate class representative given the conflicts between his interests and those of the class, and the court accordingly modified the class definition. Addendum 24-26; App.24-26;

R.Doc. 1609 at 24-26. The court next turned to ascertainability, finding that "the task of identifying the owners is not so impossible as to prevent class certification," notwithstanding the complexities in identifying the actual owners of the fed cattle sold to Defendants. Addendum 27; App.27; R.Doc. 1609 at 27.

The court then turned to Defendants' arguments concerning the predominance requirement of Rule 23(b)(3) and, in particular, their arguments why Plaintiffs had failed to show common impact and thus the predominance of common issues over individual ones. Addendum 28-34; App.28-34; R.Doc. 1609 at 28-34. Two aspects of the court's decision on predominance are most important here—the first goes to the lack of common impact from the conspiracy Plaintiffs allege, and the second goes to the lack of common impact on the class Plaintiffs represent.

First, the court recognized that "Defendants may be correct that the alleged episodic conduct had only episodic impact." Addendum 30; App.30; R.Doc. 1609 at 30. But rather than hold that, as a result, Plaintiffs had not carried their burden of proving common impact, the court held that "Defendants would have to present evidence to that end [*i.e.*, to the end that episodic conduct had only episodic impact] to undermine [Plaintiffs'] theory of harm to the fact finder at trial." *Id.*

Second, the court recognized that Lamb's opinions "rest[] on data covering only feedlot transactions, not class member [*i.e.*, fed cattle producer] transactions." Addendum 33; App.33; R.Doc. 1609 at 33. The court nevertheless held that use of a

proxy was acceptable, ignoring the reasons Defendants had identified as to why it was not. Addendum 30-33; App.30-33; R.Doc. 1609 at 30-33.

## SUMMARY OF ARGUMENT

Rule 23(b)(3) requires plaintiffs seeking to advance a case for damages on a class basis to offer evidence proving that common questions "predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). This is a "demanding" requirement. *Hudock v. LG Elecs. U.S.A., Inc.*, 12 F.4th 773, 776 (8th Cir. 2021) (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013)). And necessarily so—it ensures that the "proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). Where, as here, the case involves an alleged conspiracy, plaintiffs must satisfy this requirement by proving that any impact from the alleged conspiracy on the class members can be established on a "systematic, classwide" basis—they must establish that, assuming the conspiracy occurred, it led to common impact. *Blades*, 400 F.3d at 575. And where plaintiffs fail to do that—where they fail to show with common evidence that all (or nearly all) were impacted—then individual inquiries will be required to determine any such impact. *See id.* In that event, "[t]he need to identify those individuals will predominate" over any common questions in the case. *In re Asacol Antitrust Litig.*, 907 F.3d 42, 53-54 (1st Cir. 2018). And that,

in turn, means that the predominance requirement in Rule 23(b)(3) is unmet, and the case cannot proceed on a class basis.

Here, Plaintiffs failed to carry their Rule 23(b)(3) burden to show common impact, and this Court should reverse the district court's certification order, for two fundamental reasons.

First, Plaintiffs failed to show common impact from the conspiracy they allege. Plaintiffs assert Defendants' alleged conspiratorial conduct is episodic, meaning it occurred at some times but not others, and extended to some fed cattle producers but not others. Lamb acknowledged this: he admitted that a single episodic slaughter reduction would not affect all class members across the alleged conspiracy period, and that multiple alleged slaughter reductions would have to occur to have sustained price effect. Moreover, Plaintiffs' selling conduct is also episodic. Twenty percent of the feedlots analyzed made only one sale during the entire alleged conspiracy period. Yet Plaintiffs offered nothing to show that the sales by those twenty percent—or anyone at all—corresponded to Defendants' alleged episodic slaughter reductions such that there was common impact from the alleged conspiracy. And even if they had made such a showing, Plaintiffs still would have failed to carry their burden. That is because Plaintiffs allege not only episodic conduct, but also rely on an elongated chain of causation from that conduct to attempt to prove common impact. Plaintiffs assert that the episodic slaughter

reductions would have impacted not only those in a cash market at the time and place of the episode but also those who sold through different AMAs and in different places with different pricing terms. Yet, again, Plaintiffs offered no evidence showing this ever did, or would, happen. Given both failures, Plaintiffs failed to show common impact from the conspiracy they allege and, for this reason, the class should not have been, and cannot be, certified.

Second, Plaintiffs failed to show common impact on the class they represent. Plaintiffs' most fundamental problem is that they relied on evidence of purported impact on a proxy for, rather than the members of, the putative class. Were that not enough, the proxy Plaintiffs chose reveals far too many unimpacted class members for this case to proceed on a class basis. On both grounds, Plaintiffs failed to show common impact on the class they represent and, for this additional reason, the class should not have been, and cannot be, certified.

## STANDARD OF REVIEW

This Court reviews the district court's decision to certify a class for abuse of discretion. *Cody v. City of St. Louis ex rel. Med. Sec. Inst.*, 103 F.4th 523, 528 (8th Cir. 2024). The district court abuses its discretion when it commits an error of law, including when it fails to conduct the rigorous analysis required prior to class certification. *Id.* at 528, 530-31. It also abuses its discretion when it makes clearly erroneous factual findings. *Id.* at 528.

## ARGUMENT

Plaintiffs' burden is to show common impact from the conspiracy they allege, on the class they represent. Plaintiffs failed to carry their burden as to both parts of this foundational requirement of Rule 23(b)(3).

### I. Common Issues Do Not Predominate Given Plaintiffs' Failure to Offer Evidence Showing Common Impact From The Conspiracy They Allege.

The district court erred in failing to hold Plaintiffs to their fundamental obligation to offer evidence showing that impact from the conspiracy they allege can be proven with common evidence. Nothing considered by the district court or offered by Plaintiffs can obscure—or cure—that failure.

#### A. Plaintiffs Failed To Offer Evidence Of Common Impact From The Conspiracy They Allege.

To carry their burden on predominance in a case involving an alleged conspiracy, a plaintiff must offer evidence showing that "impact" from the alleged conspiracy "can be proven on a systematic, class-wide basis." *Blades*, 400 F.3d at 569. That is, a plaintiff must "identif[y] a common methodology capable of allowing the [court] to determine that each member of the proposed class suffered antitrust injury and damages *as a result of the challenged conduct*." 1 McLaughlin on Class Actions § 5:36 (21st ed.) (emphasis added). Or, in the Supreme Court's words, a plaintiff must offer common evidence "translating" the "*legal theory of the harmful event* into an analysis of the economic impact *of that event.*" *Comcast*, 569 U.S. at 38 (quoting Federal Judicial Center, Reference Manual on Scientific Evidence 432

(3d ed. 2011)). When this evidence is not offered, and the record instead shows that "the members of the proposed class will need to present evidence that varies from member to member" to show impact from the alleged unlawful conduct, then individual rather than common questions predominate, and the class cannot be certified. *Blades*, 400 F.3d at 566.

Here, Plaintiffs assert a unique conspiracy—one based on episodic conduct that purportedly affected all fed cattle sold in every transaction for nearly five years, no matter when the fed cattle were sold, and no matter whether the fed cattle were sold in the cash market or through an AMA, or in Washington or Texas (or anywhere else). Yet Plaintiffs failed their fundamental obligation to offer evidence showing impact from that alleged conspiracy can be proven with common evidence for two reasons: (1) they presented no evidence of common impact from the episodic conduct they allege, and (2) they offered no evidence of common impact linked to the elongated chain of causation they posit.

### 1. No Common Impact Given Episodic Conduct.

This Court's decision in *Blades* demonstrates why Plaintiffs have failed to show systematic, classwide impact given the episodic conduct at the center of the alleged conspiracy. There, the plaintiffs alleged that the defendants conspired to inflate the price of certain seeds. 400 F.3d at 573. But the evidence showed that, even assuming the defendants "performed [the alleged conspiratorial] agreement,

their performance was not across the board, but extended to some [seed] list prices and not to others." *Id*. "Consequently," the Court recognized, "to show injury from price inflation, each plaintiff would need to present evidence that the list prices of the seeds he purchased, not just some or even most of the hundreds of list prices on [the defendants'] price lists, were inflated." *Id.* Said another way, it was "clear that some potential class members would require particularized evidence showing that the specific list prices pertinent to them were included in any performance of appellees' agreement to inflate prices." *Id.* at 574. Given that clear reality, the Court held that the plaintiffs had failed to show that "impact can be proven on a systematic, class-wide basis," common issues thus did not predominate, and the class could not be certified. *Id.* at 569 (quoting *Sample v. Monsanto Co.*, 218 F.R.D. 644, 650 (E.D. Mo. 2003)).

Although this case involves fed cattle, not seeds, it is like *Blades* in the way that matters most: Defendants' performance of the alleged conspiracy concededly was not "across the board." Instead, it was episodic. As in *Blades*, for purposes of Rule 23(b)(3), the Court can assume that Defendants performed the conspiracy as alleged. But given that the performance as alleged was episodic, it would have extended to (*i.e.*, affected) some Plaintiffs and not others. Lamb himself acknowledged as much: he admitted that a single episodic slaughter reduction would not affect all class members across the entire alleged conspiracy period, and that

there would have to be multiple alleged slaughter reductions throughout the period to have sustained price effect. App.808-09; R.Doc. 1099-2 at 159:3-160:10.

Despite identifying the threshold necessary to attempt to show common impact, Lamb failed to reach it. He failed even to achieve step one, for he did not identify any episodic reductions at all. Compounding that failure, Lamb, and thus Plaintiffs, offered no evidence showing how the different episodic slaughter reductions Plaintiffs alleged could have impacted anyone, including, most obviously, fed cattle producers who sold long before or after the alleged episodes, or fed cattle producers who sold only episodically (or only once) during the alleged conspiracy period. That means, like the plaintiffs in *Blades*, Plaintiffs here "would require particularized [*i.e.*, individualized] evidence showing that" an alleged conspiratorial episodic reduction, assuming it occurred, was actually "pertinent to them." 400 F.3d at 574. That, in turn, means that the question of impact from the alleged conspiracy will be an individualized one rather than a common one. And because the question of impact is a central question in a conspiracy case like this, individualized rather than common issues will necessarily predominate. *See id.*

Other courts have denied certification on similar facts. For example, in *In re Aluminum Warehousing Antitrust Litigation*, 336 F.R.D. 5 (S.D.N.Y. 2020), the plaintiffs asserted the defendants formed a conspiracy involving "destocking" certain aluminum warehouses to affect the price of aluminum. But the evidence

showed the destocking conduct "waxed and waned during the class period." *Id.* at 56. As the court explained, the "conspiratorial activity," destocking, was "off-and-on," and yet the plaintiffs (and their expert) did "not provide any assurance that putative class members who, for example, purchased aluminum during a phase of the conspiracy when defendants were refraining from 'destocking' [*i.e.*, the conduct was "waning" or "off"] suffered the same harm resulting from anticompetitive conduct as putative class members who purchased aluminum" when the conduct was "at its zenith," *i.e.*, the conduct was "waxing" or "on." *Id.* This Court could (and should) swap "episodic reductions" for "destocking" and, like the court in that case, hold that Plaintiffs failed to show common impact, and so the class cannot be certified under Rule 23(b)(3). *See id.*

*Nypl v. JP Morgan Chase & Co*., 2022 WL 819771 (S.D.N.Y. Mar. 18, 2022), is another instructive case. There, the plaintiffs asserted the defendants conspired to manipulate exchange rates in the foreign exchange spot market to manipulate benchmark rates. The plaintiffs acknowledged these purported manipulation efforts were "episodic and multidirectional" (*id.* at *4), and could not show how they could prove common impact with common evidence given that concession. The court therefore concluded that the plaintiffs would have to conduct a "day-by-day individualized analysis" to determine whether a given plaintiff's transaction actually overlapped with an "episodic" manipulation. *Id.* at *8. Accordingly, the court held

the proposed class could not be certified. *Id.* at *10; *see also Nypl v. JP Morgan Chase & Co.*, 2023 WL 2712214, at *4 (S.D.N.Y. Mar. 30, 2023) (confirming denial of certification and explaining that a "conspiracy's impact may be episodic and multi-directional, even though the conspiracy itself is continuous and eliminates competition on a 'constant' basis"), *aff'd sub nom. McCarthy v. Bank of Am., N.A.*, 2024 WL 2206794 (2d Cir. May 16, 2024).

Here, the same outcome is warranted. In any would-be class action, and especially important when the case involves conduct that is "not across the board," or is "off-and-on," or "episodic," the plaintiffs must show that "impact" from the alleged conspiracy can be "proven on a systematic, classwide basis." *Blades*, 400 F.3d at 569. Plaintiffs have not done so. They offered no evidence showing the alleged episodic slaughter reductions—reductions they admitted would have only episodic price effect—would impact all or nearly all class members across the five-year alleged conspiracy period. *See* App.808; R.Doc. 1099-2 at 159:3-22. In fact, they did not identify any such alleged episodic reductions at all, at any point during the alleged conspiracy period. App.809; R.Doc. 1099-2 at 160:1-10. Accordingly, impact from the alleged conspiracy will require proof on an individualized, rather than classwide basis, which means that common issues do not predominate. Because Plaintiffs did not prove common impact from the conspiracy they alleged, this case cannot proceed on a class basis.

### 2. No Common Impact Given Elongated Chain Of Causation.

Plaintiffs also failed to show systematic, classwide impact from the alleged conspiracy because the alleged chain of causation upon which they rely to assert classwide impact is elongated, and unsupported by evidence to prove any of the several inferences required to show classwide impact from Defendants' alleged conduct. Where, as here, plaintiffs seek to bring a class action with a multi-step, or elongated, theory of causation, they must demonstrate through common, classwide proof that *each link in the causal chain*—*i.e.*, the workings of the conspiracy—actually occurred. This requirement flows from Rule 23(b)(3)'s predominance standard: if any step in the chain of causation requires individualized inquiry, common questions will not predominate, and class certification must be denied. As this Court put it in *Blades*, proof of the "*workings* of [an] alleged conspiracy" "goes … to the element of … injury," and a plaintiff seeking to prosecute an antitrust conspiracy claim on a class basis must proffer common evidence not just of the alleged conspiracy but of its "resultant injury" because "proof of conspiracy is not proof of common injury." 400 F.3d at 571-72; *see also In re Aluminum Warehousing*, 336 F.R.D. at 46 ("to sustain a certified class, [the plaintiffs] must show by competent common proof each step in the causal chain").

Here, however, Plaintiffs offered no evidence of the "workings" of the elongated chain of causation they allege. Plaintiffs' theory of impact from the

alleged conspiracy is not merely that one or more episodic slaughter reductions would reduce the price of all fed cattle no matter how or where sold; instead, it is that one or more episodic slaughter reductions would reduce the price of fed cattle for those selling in the relevant regional cash market at or around the time of a given reduction in that market, and that any such reduction would then also affect those selling in other cash markets and through AMAs, anywhere and everywhere across the country. Lamb himself outlined the theory this way:

> Defendants "[A] agreed to collectively restrain the volume of cattle purchased and [B] subsequently slaughtered below available supply … to [C] suppress demand for … cattle sold in the 'cash' market … [which] … [D] artificially reduced the prices at which fed cattle were sold in the 'cash' market, which in turn [E] artificially reduced prices of fed cattle sold through alternative marketing arrangements [that contained pricing mechanisms tied to cash cattle prices]" with the result that [F] all fed cattle prices were decreased.

App.147-48; R.Doc. 883-1 ¶ 9; *see also* App.910; R.Doc. 1256 at 1.

Lamb, and therefore Plaintiffs, nonetheless offered no evidence showing how one or more conspiratorial episodic purchase and slaughter reductions (even assuming they did occur and that Plaintiffs actually identified them), would work through the elongated chain they posit—from A to B, C, D, E, and F, in succession—so as to impact all (or nearly all) class members. In particular, Lamb did not: identify a single episodic reduction; show any impact on fed cattle prices even in the local cash market where the reduction allegedly occurred; show any impact on prices in a

single AMA tied to that local cash market; show any impact on prices in any other cash market; or show any impact on prices in AMAs tied to any of those other cash markets. Indeed, Lamb did not even try to make any of these showings. Accordingly, to demonstrate impact as a result of the alleged conspiratorial conduct, this showing will need to be made on an individual basis—each fed cattle producer will have to show how a claimed injury can be traced back through the elongated, attenuated chain of causation Plaintiffs posit to one or more alleged episodic reductions. Because those individualized inquiries will overwhelm any common questions, the class cannot be certified. *In re Asacol*, 907 F.3d at 53-54.

Other courts have rejected certification on similar grounds. In *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6 (1st Cir. 2008), the plaintiffs, car purchasers, alleged an agreement to restrict car supply, along with a multi-step, "novel theory" of injury resulting from that agreement. *Id.* at 25. Specifically, the plaintiffs alleged the defendant U.S. carmakers engaged in practices that depressed the supply of cars imported into the United States, and asserted they were impacted by this conduct through two steps: first, the "stifling" of imports allegedly led to increases in dealer invoice prices and the Manufacturer's Suggested Retail Prices ("MSRP"); second, these price increases in turn increased the prices the plaintiffs actually paid for their cars, because those prices ultimately "fall within the range between the dealer invoice price and the MSRP." *Id.* at 10.

The First Circuit held that, to show common impact, plaintiffs would have to demonstrate "the key logical steps behind their theory." *Id.* at 26. Thus, for the first step, the plaintiffs had to show the defendants' actions actually resulted in inflated dealer invoice prices and MSRPs, and, for the second step, the plaintiffs had to show those higher prices actually caused them to pay higher prices notwithstanding individualized negotiations over the ultimate purchase price. *Id.* at 28. A mere "inference"—even an "intuitive[ly] appealing" one—that "any upward pressure on national pricing [from purportedly inflated dealer invoice prices and MSRPs] would necessarily raise the prices actually paid by individual consumers" was not enough. *Id.* at 29. Because the court found that plaintiffs failed to make both showings, it held the class could not be certified. *Id.* at 29-30.

The same basic failure also meant the class could not be certified in *Aluminum Warehousing*, 336 F.R.D. 5. As noted, the plaintiffs there alleged that the destocking activity occurred at different times (that it "waxed and waned"), but also alleged—as the court phrased it—that any impact from the destocking activity would be effected, if at all, only after multiple steps: first, the defendants allegedly lengthened queues to store aluminum at certain warehouses; then, as a result, certain regional prices would increase; and then, as a result, the prices for certain supply contracts tied to those regional prices would increase, causing certain aluminum smelters to charge more, and thus, class members to pay more, for aluminum. *Id.* at 46, 56-57.

Given the "elongated causal chain between the alleged agreement to take steps toward lengthening queues at [certain] warehouses and the purported payment by direct purchasers of an inflated price," the court held that, "to sustain a certified class, [plaintiffs] must show by competent common proof each step in the causal chain leading from conspiratorial agreement to price impact on direct purchasers." *Id.* at 46. Because the plaintiffs failed adequately to do this, the court held the plaintiffs had failed to show common impact from the alleged conduct. *Id.* at 51-63.

The same result is warranted here for substantially the same reason, and even more so given that Plaintiffs' chain of causation is even more elongated. Plaintiffs have done nothing to show that the "workings" of their elongated chain of causation can be established on a common basis. *Blades*, 400 F.3d at 571-72. They have failed to come forward with common evidence "translat[ing]" the "*legal theory of the harmful event* [here, episodic slaughter reductions] into an analysis of the economic impact *of that event.*" *Comcast*, 569 U.S. at 38. Accordingly, for this additional reason, Plaintiffs have failed to carry their burden to show common impact from the conspiracy they allege.

To sum up, and to put Plaintiffs' problem in concrete terms: Plaintiffs failed to show with common evidence that the allegedly unlawful conduct they assert—episodic slaughter reductions—in, say, 2015 or 2017 would impact fed cattle producers who sold fed cattle in, say, 2016 or 2018. And, even if Plaintiffs had

offered this evidence, they still offered no evidence that an episodic reduction in a cash market in, say, Amarillo, Texas in 2015 or Greeley, Colorado in 2017, would impact fed cattle producers who sold in a different cash market or through one or more different AMAs in, say, Omaha, Nebraska or Dodge City, Kansas at any time during the alleged conspiracy. To determine any impact would therefore require individualized inquiries: the district court would have to determine on an individual-by-individual basis which fed cattle producers (or whether any fed cattle producers at all) actually were impacted by the alleged conspiracy. And those individualized inquiries would overwhelm any common questions in the case such that common questions do not predominate. *See Blades*, 400 F.3d at 574.

### B. Nothing Plaintiffs Offer Can Sustain The Certification Order.

Despite Plaintiffs' clear failure to demonstrate common impact from the conspiracy they allege—whether due to the episodic conduct or the elongated chain of causation—the district court nonetheless certified the class. Its analysis, however, was fundamentally flawed. Indeed, the district court certified the class notwithstanding its recognition that Plaintiffs had failed to show common impact from the alleged conspiracy on the class members. *See* Addendum 30-33; App.30-33; R.Doc. 1609 at 30-33. That holding cannot be defended. And any effort to sustain the court's order by recharacterizing the alleged conduct as a price fixing conspiracy or by highlighting other evidence of purported common impact would fail.

***Recharacterizing the Alleged Conspiracy.*** Faced with their failure to offer any evidence of common impact linked to Defendants' allegedly conspiratorial conduct, Plaintiffs may again attempt to recharacterize the alleged conspiracy as a price-fixing conspiracy. *See* App.910; R.Doc. 1256 at 1. The district court appeared to accept this move. *See* Addendum 30; App.30; R.Doc. 1609 at 30.

This Court should not. Even if the purpose of the alleged conspiracy was to affect prices (no doubt the purpose of nearly every alleged antitrust conspiracy), *purpose* is different from *conduct*. And it is conduct not purpose, to which Plaintiffs must link evidence of common impact. *See Blades*, 400 F.3d at 575; *Comcast*, 569 U.S. at 38; *see also Tex. Grain Storage, Inc. v. Monsanto Co.*, 2019 WL 4087430, at *3 (W.D. Tex. June 24, 2019) (plaintiff's failure "to connect *the type of anticompetitive conduct being alleged* with the economic impact alleged to result *from that conduct* . . . runs afoul of the Supreme Court's dictate in *Comcast*") (emphasis added). For the reasons explained, Plaintiffs have not done that here—they have failed to offer evidence of systematic, classwide impact not only because of the episodic conduct they have alleged but also because of the elongated chain of causation paired with that conduct—and Plaintiffs cannot now support their motion for class certification by simply relabeling their liability theory as a price-fixing conspiracy.

*Miami Products & Chemical Co. v. Olin Corp.*, 2023 WL 8946114 (W.D.N.Y. Dec. 28, 2023), is instructive in this regard. There, as here, the plaintiffs (incidentally, using a model from Lamb) attempted to pass their case off as a "straightforward horizontal price-fixing conspiracy." *Id.* at *16. The Court rejected that move, recognizing that plaintiffs' theory was far "more complex than the paradigmatic case in which competitors secretly agree upon a price and then simply charge [it]." *Id.* The plaintiffs there had not alleged that the defendants simply conspired to fix prices but instead advanced the theory that the defendants had "conspired to issue coordinated price increase announcements, which led to artificially increased 'spot prices or prices under freely negotiated contracts'" that later led to purported impact on all (or nearly all) class members. *Id.* Given that theory, the Court held that "injury [could] be shown only by proof that artificially increased negotiated prices caused by the Defendants' alleged conspiracy were in fact incorporated into the specific indices referenced in those contracts." *Id.* It was not enough to simply contend the case was all about price-fixing. That same analysis applies here.

***Highlighting Other Evidence.*** To attempt to defend the certification order, Plaintiffs are also likely to highlight Lamb's common average price regression and attendant in-sample prediction as their chief evidence in support of common impact. *See* App.334, 363; R.Doc. 883-1 ¶¶ 378, 413 n.880; *see also* App.795; R.Doc. 1099-

2 at 140:5-10. The district court relied on this evidence in reaching its decision. *See* Addendum 30-33; App.30-33; R.Doc. 1609 at 30-33.

This Court should not credit this evidence. This evidence, untethered to the episodic conduct Plaintiffs allege, and the elongated chain of causation with which it is paired (as explained above), does not resolve Plaintiffs' basic predominance problem since, by definition, it can speak only to an average impact. Common average regressions may show common impact when the allegedly unlawful conduct is "across the board" and the asserted "workings" of the conduct are straightforward, but not when the allegedly unlawful conduct is episodic and the asserted workings of the conduct extend over multiple transaction types and geographic locations. *Blades*, 400 F.3d at 573-74. Indeed, that is precisely why a common average was not enough in *Blades*—it may have shown an average reduction in seed prices, but it did not account for the potential lack of impact on individual class members given the variations between specific class members' transactions with the defendants. *See id*. So, too, here—as the district court itself recognized: "Dr. Lamb chose to calculate average damages over the entire Producer Class Period … *an average which necessarily conceals variations*." Addendum 37; App.37; R.Doc. 1609 at 37 (emphasis added).

Like this Court in *Blades*, other courts have reached the same result in cases similarly involving episodic, varying, or non-pervasive conduct. For example, in

*Aluminum Warehousing*, the court rejected a common average price regression as evidence of common impact, explaining that such a regression cannot be the basis for common impact where there is "significant variation in the level of purported conspiratorial activity at any given moment during the class period." 336 F.R.D. at 57. And there are still further examples. Across many contexts, courts have recognized that common average models cannot prove common impact when the evidence shows variations in the relevant conduct or circumstances. *See, e.g.*, *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 2025 WL 3240044, at *7-12 (S.D.N.Y. Nov. 20, 2025) (variation in class members' bargaining power and use of individual negotiations); *In re Pharmacy Benefit Managers Antitrust Litig.*, 2017 WL 275398, at *32 (E.D. Pa. Jan. 18, 2017) (variation in local market forces); *In re Flash Memory Antitrust Litig.*, 2010 WL 2332081, at *10 (N.D. Cal. June 9, 2010) (variation in price trends across individual and classes of purchased goods); *Best Pallets Inc. v. Brambles Indus., Inc.*, 2009 WL 10672543, at *11 (W.D. Ark. Aug. 17, 2009) (variation in class members' contractual and business models); *see also In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 494 (N.D. Cal. 2008) ("averages can hide substantial variation across individual cases, which may be key to determining whether there is common impact" (quoting ABA Section of Antitrust Law, Econometrics: Legal, Practical, and Technical Issues 220 (2005)). And, importantly, where the regression cannot be used to show common impact

given such variations, any attendant in-sample prediction adds nothing. *See In re Outpatient Med. Ctr. Emp. Antitrust Litig.*, 2026 WL 1678954, at *10 (N.D. Ill. June 10, 2026) (rejecting in-sample prediction where "main regression" was deficient).

Under these decisions—both this Court's authoritative decision in *Blades* and persuasive decisions from other courts—the common average price regression and attendant in-sample prediction likewise cannot provide the basis for common impact in this case. The regression only shows an average (purported) impact—it cannot, and did not, show systematic, classwide impact from Plaintiffs' alleged conspiracy tied to episodic conduct. *Cf. In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 194 (3d Cir. 2020) (on interlocutory review, reversing class certification order that failed to determine whether Lamb's average price model "mask[ed] individualized injury").

The other analyses Lamb offered also cannot provide the basis for common impact in this case. The district court referenced this evidence, including evidence concerning the "characteristics of the Fed Cattle Industry," the "price structure for fed cattle prices," and the "structural characteristics of the fed cattle market," suggesting they all supported a finding of common impact. Addendum 32; App.32; R.Doc. 1609 at 32. They do not. Evidence of this sort can only suggest that prices generally rise and fall together. It does not address the reality of Plaintiffs' episodic case theory in which prices would rise and fall (or fall and rise) at different points

during the alleged conspiracy period, based on the alleged episodic reductions. Nor does it deal with Plaintiffs' failure to offer any evidence showing common impact notwithstanding conceded variations and their own episodic selling, and notwithstanding the elongated chain of causation they assert. *Cf. Miami Prods.*, 2023 WL 8946114, at *19 (holding "the existence of a pricing structure cannot demonstrate classwide antitrust injury" in the "absence of a common proof mechanism where the alleged cartel could have raised prices on class members," and rejecting certification).

Nor, finally, can Plaintiffs' reference to anecdotal evidence from Defendants' internal communications or other documents purporting to show instances of episodic slaughter reductions (*see* App.101-02; R.Doc. 880 at 21-22) backfill the evidentiary gaps in Plaintiffs' bid for class certification. It is not evident that these reductions even occurred (or, even if they did, why). In any event, what matters is that Lamb acknowledged that these episodic reductions would have only episodic (if any) impact. He never showed how any such purported impact would affect all (or nearly all) class members over the five-year alleged conspiracy period. And he never showed how that would be possible in light of the elongated chain of causation Plaintiffs posit. *See* App.808-09; R.Doc. 1099-2 at 159:3-160:10; *see also* App.307-09; R.Doc. 883-1 ¶¶ 323-27 (backing up operates only "for a time").

At bottom, Plaintiffs have no answer and no excuse—they failed to show common impact from the conspiracy they allege. That means that individual rather than common issues predominate on the core question of impact. The district court thus erred in certifying the class.

## II. Common Issues Do Not Predominate Given Plaintiffs' Failure to Offer Evidence Showing Common Impact On The Class They Represent.

The district court erred in relieving Plaintiffs of their burden to show common impact from the conspiracy they allege, and it erred in failing to hold them to their burden to show common impact on the class they represent. For this additional reason, individualized inquiries would be required on the core question of impact, and those individualized inquiries would mean that common questions do not predominate in this case.

Under this Court's precedents, before a class can be certified, it must be "defined in such a way that *anyone* within it" has Article III standing. *Johannessohn v. Polaris Indus. Inc.*, 9 F.4th 981, 987-88 (8th Cir. 2021) (emphasis added) (quoting *Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1034 (8th Cir. 2010)). Expressed differently, a "district court may not certify a class defined in such a way that 'it contains members who lack standing'" because they were not impacted by the alleged unlawful conduct. *Glasscock v. Sig Sauer, Inc.*, 182 F.4th 740, 742 (8th Cir. 2026) (quoting *Johannessohn*, 9 F.4th at 984). Other courts, including the district court below, have applied a different standard, holding that a class cannot be certified

under Rule 23(b)(3) if more than a de minimis number of class members—which the district court took to mean 5% to 10%—are unimpacted by the alleged conduct. Addendum 16; App.16; R.Doc. 1609 at 16. Whatever the standard, and whether grounded in Article III or Rule 23(b)(3) (or both), Plaintiffs have failed to meet it here for two reasons: first, they have not even attempted to show common impact on the class but instead on a purported proxy; second, because the proxy Plaintiffs chose and the district court credited to show common impact reveals potentially thousands upon thousands of unimpacted class members—confirming that Plaintiffs have failed to carry their burden to show common impact on the class they represent.

### A. No Common Impact Given The Use Of A Proxy.

At the threshold, a would-be class representative must show sufficient common impact on "the *class*" they actually purport to represent. *Blades*, 400 F.3d at 569 (emphasis added).

Plaintiffs have not satisfied this threshold requirement. They proposed a class of "[a]ll persons or entities within the United States that directly sold to a Defendant one or more fed cattle for slaughter" Addendum 9; App.9; R.Doc. 1609 at 9. But Plaintiffs' chief evidence of purported common impact—Lamb's common average price regression and attendant in-sample prediction—does not concern that class at all. Instead, it concerns a collection of feedlots. Yet feedlots are "not always the same as the [fed] cattle producer," *i.e.*, the putative class member; in many instances,

the feedlot is acting as a "custom feedlot" and selling on behalf of the class member, but it is not the class member itself. App.362-63; R.Doc. 883-1 ¶ 413. Showing common impact on a collection of feedlots does not show common impact on a class of fed cattle producers. Consequently, Plaintiffs have not shown common impact on the "class" they represent. *Blades*, 400 F.3d at 569. Indeed, under a straightforward application of this Court's Article III precedents, Plaintiffs have failed to show that "anyone" within the class has standing, and so the class cannot be certified. *Johannessohn*, 9 F.4th at 987-88 (a class must be "defined in such a way that *anyone* within it" has standing) (emphasis added).

In response to this basic problem, Plaintiffs offered, and the district court considered, two arguments: one legal and one factual. Both fail.

***Legal Argument.*** The legal argument is that other courts, including the Ninth Circuit, have allowed certification based on sampling, or a subset of the putative class. *See, e.g.*, *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 672 (9th Cir. 2022) (en banc). But even if this Court were inclined to follow other courts, Plaintiffs have not assessed impact by sampling. It is one thing to draw from a sample of relevant transactions. It is another to draw from an entirely different set of transactions, and then assert that it is similar enough to the relevant transactions to serve as a substitute for them. Neither Plaintiffs nor the district court cited any case in which purported common impact was established this way. This

Court should not allow this case to be the first—especially given its rule that a "district court may not certify a class defined in such a way that 'it contains members who lack standing'" because they were not injured by the alleged unlawful conduct. *Glasscock*, 182 F.4th at 742 (quoting *Johannessohn*, 9 F.4th at 984).

***Factual Argument.*** The factual argument rests on Lamb's use of the "Payee" field found in the purchase data of one Defendant, Cargill. App.362-63; R.Doc. 883-1 ¶ 413. To support his use of feedlots as proxies for class members, Lamb ran his analysis on these Payees, assuming that they represent actual class members because they were the recipients of payments from the feedlots. According to Lamb's reasoning, if he could also show common impact on these Payees, it would justify the use of feedlots as proxies for class members, because it would show that the Payees were impacted more or less in the same way that the feedlots were impacted. Lamb's analysis showed that 95.6% of Payees had at least one underpayment compared to 98.6% of feedlots with at least one underpayment. App.362-63; R.Doc. 883-1 ¶¶ 412-13. Lamb, and thus Plaintiffs, claimed that these numbers were close enough to justify the use of feedlots as proxies for class members—calling the analysis "robust." App.123; R.Doc. 880 at 43 n.152. The district court agreed, noting that "for at least one Defendant, Cargill, feedyard and payee data was consistent." Addendum 33; App.33; R.Doc. 1609 at 33. This was an error. For two different reasons, this factual argument for use of the feedlots as

proxies fails, and this Court should not permit certification to stand based on this analysis.

First, the analysis is wrong. The Payee in the Cargill sales data "is not necessarily[] the owner of the cattle" but "simply the person or entity to whom [Cargill] was asked to provide payment for cattle." App.890; R.Doc. 1099-6 at 8. That is, the Payee field simply represents the party Cargill paid for the cattle, which could have been a broker, lender, other stakeholder, or any other designee—none of whom would be the actual class member. *Id.* Critically, Plaintiffs did not, and could not, dispute this point. *See* App.928; R.Doc. 1256 at 19. But if these Payees are not actual class members, Lamb's effort to prove that impact on these Payees (sort of) tracked impact on the feedlots does nothing to carry Plaintiffs' burden to show common impact on actual class members. It simply shows that impact was (sort of) consistent between one alleged proxy and another.

Second, the analysis is incomplete. Whatever may be said about these Payees, Lamb found them only in Cargill's purchase data. *See* App.170, 362-63; R.Doc. 883-1 ¶¶ 43 n.67, 413; App.840; R.Doc. 1099-2 at 363:5-9. Accordingly, he has no basis to conclude that impact on feedlots would track impact on actual class members for any transactions with any other Defendant (*i.e.*, the vast majority of the transactions at issue since Cargill is just one of four Defendants in this case). *See* App.197-98, 363-64; R.Doc. 883-1 at ¶¶ 97 & Table 7, 415-16 & Tables 24-25.

For each reason, the factual argument for construing purported common impact on a proxy as common impact on the class fails. And no basis exists for this Court to allow proof of common impact to proceed by proxy.

### B. No Common Impact Given That Use Of A Proxy Reveals Large Numbers Of Unimpacted Class Members.

Even if the Court were to permit Plaintiffs to proceed by proxy, it should still hold that Plaintiffs have failed to carry their burden to show common impact on the class they represent since their chosen proxy actually reveals a lack of common impact. Plaintiffs' basic rationale for using feedlots as proxies for class members is that, one way or another—under Lamb's Payee analysis or otherwise—the feedlots would eventually pass along any alleged underpayment to the fed cattle producers, *i.e.*, the actual class members, on whose behalf they sold the fed cattle. The district court accepted this proposition (notwithstanding the lack of evidence), saying feedlots would pass on underpayments "regardless of the ownership arrangement." Addendum 33; App.33; R.Doc. 1609 at 33.

This rationale ultimately is Plaintiffs' undoing. If the intuition behind the rationale holds—that, one way or another, feedlots would eventually pass on to class members any underpayment regardless of the ownership arrangement—then the converse also holds: if there was not an underpayment but an *overpayment* (as the Court recognized occurred from June 2015 to August 2015, for example (Addendum 37; App.37; R.Doc. 1609 at 37)), then, one way or another, feedlots also would pass

on the overpayment regardless of the ownership arrangement. And if there was neither an underpayment nor an overpayment, there would be nothing to pass along. This is a problem for Plaintiffs because Lamb's own analysis shows there were dozens of unimpacted feedlots, and his own opinion is that feedlots can sell on behalf of as many as 100 different class members. *See* App.170, 362; R.Doc. 883-1 ¶¶ 43 n.67, 412. Dozens multiplied by hundreds equals thousands—and potentially tens of thousands. In short, accepting the rationale undergirding reliance on feedlots as proxies for class members (core to Plaintiffs' proffered basis for common impact), would necessarily have a multiplier effect revealing potentially thousands upon thousands of unimpacted class members.

It is Plaintiffs' burden to show common impact on the class they represent. And, of course, a record reflecting the possibility of thousands upon thousands of unimpacted class members means that Plaintiffs have not carried their burden—it is not a record that can support certification under Rule 23(b)(3). Not under the de minimis rule derived from Rule 23(b)(3) and applied by the district court, Addendum 16; App.16; R.Doc. 1609 at 16. And, even more, not under this Court's Article III precedents holding that a "district court may not certify a class defined in such a way that 'it contains members who lack standing,'" since the evidence makes clear that there are some (and, indeed many) class members without standing due to lack of impact. App.362-63; R.Doc. 883-1 ¶¶ 412-13; *Glasscock*, 182 F.4th at 742 (quoting

*Johannessohn*, 9 F.4th at 984); *see also Lab'y Corp. of Am. Holdings v. Davis*, 605 U.S. 327, 332 (2025) (Kavanaugh, J., dissenting from dismissal of cert. as improvidently granted) ("Federal courts may not certify a damages class under Rule 23 when, as here, the proposed class includes both injured and uninjured class members.").

In the end, given their use of a proxy, and the unimpacted class members that using that proxy reveals, Plaintiffs failed to carry their burden to show common impact on the class they represent. That means individualized inquiries on the question of impact would overwhelm any common questions, and that common issues do not predominate in the case. For this additional reason, the district court thus erred in certifying the class.

## III. This Court Should Do What The District Court Failed to Do and Hold This Case Cannot Proceed On A Class Basis.

The district court effectively recognized why Plaintiffs had not shown common impact from the conspiracy they allege, on the class they represent—and, thus, why the case should never have been permitted to proceed as a class action. In regard to common impact from the conspiracy that Plaintiffs allege, the district court expressly found a "lack of evidence of injury to fed cattle producers during certain periods." Addendum 32; App.32; R.Doc. 1609 at 32 n.22; *see also id.* at 33, 37 (similar). That is, the district court effectively recognized that Plaintiffs had *not* shown common impact from their alleged conspiracy. In regard to common impact

on the class Plaintiffs represent, the district court expressly found that the evidence purporting to show impact "rests on data covering only feedlot transactions, not class member [*i.e.*, owner] transactions." Addendum 33; App.33; R.Doc. 1609 at 33 (emphasis altered). That is, the district court effectively recognized that Plaintiffs had *not* shown common impact on the class they represent.

Either of these two findings should have meant that the class could not be certified because the law is clear: without common impact from the conspiracy alleged, on the class represented, there is no basis for a class action under Rule 23(b)(3)—and, moreover, the requirements of Article III are unmet under this Court's precedents. Nonetheless, despite its two findings, and despite its seeming recognition of the import of those findings, the district court held that Plaintiffs could advance their case on a class basis. The Court chose to punt the core predominance question at the center of Rule 23(b)(3), asserting that Defendants would have the burden to present evidence on that question at trial, and certifying the $27 billion damages class in this case. Addendum 30-33; App.30-33; R.Doc. 1609 at 30-33. In so doing, the district court fundamentally failed its most basic obligation: to apply the applicable law from Rule 23(b)(3) to the relevant facts from the record before it. Its decision obviously cannot stand.

Nor could any other decision from the district court certifying a fed cattle producer class in this case. Plaintiffs have had many years to develop evidence

necessary to support their motion for class certification. But they have fundamentally failed to do so. Because "application of the correct legal standard" in this case can "lead to only one conclusion"—that this case cannot proceed on a class basis—remand for further certification proceedings would be "futile and improper." *Union Pac. R.R. Co. v. U.S. Dep't of Homeland Sec.*, 738 F.3d 885, 901 (8th Cir. 2013) (cleaned up). This Court should hold that this case is not one that can be or should be brought on a class basis. *See, e.g.*, *Harris v. Union Pac. R.R. Co.*, 953 F.3d 1030, 1037-39 (8th Cir. 2020) (reversing certification); *In re State Farm Fire & Cas. Co.*, 872 F.3d 567, 577 (8th Cir. 2017) (on interlocutory appeal, reversing order denying motion to dismiss and granting certification order, and remanding with directions to dismiss the complaint); *Ebert v. Gen. Mills, Inc.*, 823 F.3d 472, 480 (8th Cir. 2016) (holding that "individual issues predominate the analysis of causation and damages that must be litigated to resolve the plaintiffs' claims" and hence "[t]his matter is thus unsuitable for class certification").

## CONCLUSION

The Court should reverse the certification order and remand with instructions to deny certification.

[signatures on next page]

October 5, 2026

Respectfully submitted,

*/s/ Michelle Fischer*
Michelle Fischer

Noel J. Francisco
Julie E. McEvoy
**JONES DAY**
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
(202) 879-3939
njfrancisco@jonesday.com
jmcevoy@jonesday.com

Eddie Hasdoo
**JONES DAY**
110 North Wacker, Suite 4800
Chicago, Illinois 60606
(312) 269-4214
ehasdoo@jonesday.com

Benjamin L. Ellison
**JONES DAY**
90 South Seventh Street, Suite 4950
Minneapolis, MN 55402
(612) 217-8800
bellison@jonesday.com

Michelle Fischer
Samuel Evan Milner
**JONES DAY**
901 Lakeside Avenue
Cleveland, OH 44114
(216) 586-3939
mfischer@jonesday.com
smilner@jonesday.com

Kurt Johnson
**JONES DAY**
150 W Jefferson Avenue, Suite 2100
Detroit, MI 48226
(313) 733-3939
kajohnson@jonesday.com

***Counsel for Appellant National Beef Packing Company, LLC***

Karl J. Worsham
**ASHURST PERKINS COIE US LLP**
2525 E. Camelback Road, Suite 500
Phoenix, Arizona 85016
Tel: (602) 351-8000
Karl.Worsham@ashurstperkins.com

Susan E. Foster
**ASHURST PERKINS COIE US LLP**
1301 Second Ave, Suite 4200
Seattle, WA 98101-3804
Tel: (206) 359-8000
Susan.Foster@ashurstperkins.com

Veronica N. Onyema
**ASHURST PERKINS COIE US LLP**
700 13th Street, NW, Suite 800
Washington, DC 20005-3960
Tel: (202) 654-6200
Veronica.Onyema@ashurstperkins.com

***Counsel for Appellants Tyson Foods, Inc. and Tyson Fresh Meats, Inc.***

Kosta S. Stojilkovic
David R. Friedman
**WILKINSON STEKLOFF LLP**
2001 M Street, NW, 10th Floor
Washington, DC 20036
(202) 847-4010
kstojilkovic@wilkinsonstekloff.com
dfriedman@wilkinsonstekloff.com

Aaron D. Van Oort
John L. Rockenbach
**FAEGRE DRINKER BIDDLE & REATH LLP**
90 South 7th Street
2200 Wells Fargo Center
Minneapolis, MN 55402
(612) 766-7000
aaron.vanoort@faegredrinker.com
john.rockenbach@faegredrinker.com

X. Kevin Zhao
Holley Horrell
**GREENE ESPEL PLLP**
222 S. Ninth Street, Suite 2200
Minneapolis, MN 55402
(612) 373-0830
kzhao@greeneespel.com
hhorrell@greeneespel.com

***Counsel for Appellants Cargill, Incorporated and Cargill Meat Solutions Corporation***

## CERTIFICATION OF COMPLIANCE

I, Michelle Fischer, certify:

*Word Count.* This brief complies with the word limit of Federal Rule of Appellate Procedure 32(a)(7) because, excluding the portions exempted by Rule 32(f), it contains 12,863 words.

*Typeface.* This brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5)(A) and (6) because it has been prepared using Microsoft® Word for Microsoft 365 in 14-point, Times New Roman font.

*Virus-Free*. This brief complies with Local Rule 28A(h)(2) because it has been scanned for viruses and is virus-free.

Dated: October 5, 2026

*/s/ Michelle Fischer*
Michelle Fischer

*Counsel for Appellant National Beef Packing Company, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 5, 2026, I, Michelle Fischer, electronically filed the foregoing Appellant's Brief with the Clerk of Court for the U.S. Court of Appeals for the Eighth Circuit by using the CM/ECF system, which will send a notification of such filing to all counsel of record.

Dated: October 5, 2026

*/s/ Michelle Fischer*
Michelle Fischer

*Counsel for Appellant National Beef Packing Company, LLC*